JOURNAL ENTRY and OPINION
{¶ 1} Defendant-appellant Dwight Whatley appeals from his convictions after a jury trial on four counts of aggravated murder, two counts of attempted aggravated murder, two counts of aggravated burglary, six counts of aggravated robbery, and three counts of kidnapping, all with firearm specifications.
 {¶ 2} In his seven assignments of error, Whatley does not challenge either the sufficiency or the weight of the evidence that supports his convictions. Rather, he claims that the prosecution violated his right to equal protection of the law in its exercise of peremptory challenges during jury selection, that the trial court acted improperly in failing to conduct a hearing on his motion for a voir dire of prosecution witnesses' identification testimony, that his trial counsel provided ineffective assistance for several omissions committed during the proceedings, that "cumulative errors" compromised his right to a fair trial, and that his sentence is contrary to law.
 {¶ 3} This court thoroughly has reviewed the record with Whatley's assignments of error in mind. Although his claims that relate to his convictions lack merit, in view of the Ohio Supreme Court's decision in State v. Foster, Ohio St.3d, 2006-Ohio-856, this court is constrained to agree that his sentence is void. Accordingly, Whatley's convictions are affirmed; his sentence is vacated and the matter is remanded to the trial court for a resentencing hearing pursuant to Foster.
 {¶ 4} Whatley's convictions result from an incident that occurred on the night of March 18, 2004 at a combination delicatessen/convenience store with a connected residence located at the corner of East 79th Street and Central Avenue in Cleveland, Ohio. The store owner, Arman Howard Lovett, his live-in girlfriend, Carolyn Pitts, and their employee-boarder, Jeffrey Burton, all were present on the premises.
 {¶ 5} Pitts worked that night at the store counter when she took a food order for a young man later identified as Daniel Grant. While she prepared the order, she noticed that Grant left. Grant returned a few minutes later in the company of four other men, one of whom was Whatley; Pitts knew Whatley as "Fats."
 {¶ 6} Pitts started a conversation with Whatley as she finished preparing Grant's sandwich, but her remarks were interrupted when one of the others called out an order for "everybody [to] put your hands up." She looked up to see that the three other men had donned ski masks, and that they, Grant and Whatley all held guns in their hands. Whatley carried a shotgun.
 {¶ 7} The five men gathered Pitts, Lovett and Burton and forced the captives out to the patio area of the premises, where they each were laid on the ground to be bound hand and foot with duct tape. Pitts had a coat placed over her head. Thereafter, she heard some of the assailants running; they sought valuables in the store and the residence, since one of them demanded of Lovett the location of keys and the combination to a safe.
 {¶ 8} In spite of Lovett's apparent compliance, Whatley urged Pitts to tell him where Lovett kept all his money. He emphasized his sincerity by firing his shotgun into the concrete floor. Since he appeared to be the leader of the group, Pitts told him Lovett did not have much money, and asked him to spare her life. Whatley replied without emotion that he had to kill her because she recognized him.
 {¶ 9} Eventually, all of the captives were removed to the basement of the residence. As they lay on the floor, one of the assailants wondered "What [they were] going to do with them?" Someone answered, "Let's just do them."
 {¶ 10} From under the fabric that had been placed haphazardly over her head, Pitts saw one of the masked men use a steak knife to slice at Burton's throat. When that method did not succeed in killing Burton, another man fired a bullet into his head; Lovett also was murdered with one shot in the head. Observing these shootings, Pitts placed her hands over her head before her turn came. Although she felt a shot strike her, the bullet's force became dissipated as it passed through her hand, the fabric, and her skull; thus, Pitts did not receive a fatal wound.
 {¶ 11} Pitts waited until she believed the assailants were gone before she rose and summoned the police. When the police arrived, Pitts told them that one of the men responsible for the incident was "Fats;" she did not know Whatley's real name.
 {¶ 12} Officers followed tracks left in the snow that led to the backyard of a residence located at 2363 East 77th Street. Along the route, the officers found some of Lovett's papers and lesser valuables. Moreover, beneath a van parked in the driveway of the residence, officers discovered five weapons; one was a shotgun. Additionally, two of the handguns that were found proved, respectively, to have fired the fatal shots into Lovett and Burton, and to have fired the shot into Pitts' head.
 {¶ 13} At Whatley's trial, James Chalklett testified that on the day prior to the incident, Whatley came to Chalklett's apartment carrying a shotgun which Whatley requested to leave overnight. The following evening, Whatley returned with two other men, proceeded into a bedroom, and, subsequently, another two men arrived to join them. Curious, Chalklett looked into the room; he saw Whatley handling two handguns. Chalklett identified these guns as two of the weapons that were later recovered from underneath the van. Chalklett further testified that Whatley asked for his shotgun before the five men left together.
 {¶ 14} Similarly, Joanna Workman, who lived at 2363 East 77th Street, testified that on the night of the incident, she admitted into her home two men who were friends of her cousin just before she heard shots fired nearby. Within minutes, Whatley and another man came to her door. Workman demanded that all four of them go.
 {¶ 15} Tyshaun Hampton testified that on the night of the incident he received a telephone call from an acquaintance, who asked him to come to 2363 East 77th Street to give him a ride. When Hampton arrived, he saw that his acquaintance was in the company of four other men, one of whom was Whatley. They placed a metal box into the trunk of Hampton's vehicle before he took them to another location. Hampton later watched as the men broke into the box, which contained approximately $3,500.00 in cash. Whatley seemed unhappy with the amount. Subsequently, Hampton drove his passengers to a place where they burned the clothing they had been wearing.
 {¶ 16} Approximately three weeks after the incident, Whatley was indicted on seventeen counts, as follows: Counts 1-4, aggravated murder, each with two firearm specifications, three felony murder specifications, two mass murder specifications, and three murder to escape prosecution specifications; Counts 5 and 6, attempted aggravated murder, Counts 7 and 8, aggravated burglary, Counts 9-14, aggravated robbery, and Counts 15-17, kidnapping, each with two firearm specifications.
 {¶ 17} Whatley received the assistance of assigned counsel to represent him in his capital punishment case. His case ultimately proceeded to a jury trial. After hearing the testimony and considering the evidence presented by the state, the jury found Whatley guilty on all counts. As to the underlying felony murder specifications attached to Counts 1 through 4, the jury determined Whatley had not been the principal offender but had committed the offenses with prior calculation and design.
 {¶ 18} The jury ultimately found as to Counts 1 through 4 that the aggravating circumstances did not outweigh the mitigating factors in the case, and, thus, recommended a sentence on the capital offenses of life without the possibility of parole.
 {¶ 19} The trial court subsequently sentenced Whatley as follows: two life terms without the possibility of parole on Counts 1 through 4, ten years each on Counts 5 through 17, nine years on the firearm specifications contained in Counts 1, 3 and 5, and three years each on the firearm specifications contained in Counts 7 through 17. All the firearm specification sentences were ordered to be served consecutive to each other, for a total of twenty-one years, prior to and consecutive with the life sentences; the life sentences were ordered to be served consecutively with each other, and the ten-year terms were ordered to be served consecutively but concurrently with the life terms.
 {¶ 20} In this appeal, Whatley presents seven assignments of error, which will be addressed together when they present related issues for consideration.
 {¶ 21} Whatley's first assignment of error states:
 {¶ 22} "I. The state's use of five out of seven peremptory challenges on the exclusion of women from the jury violated the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, J.E.B. v. Alabama, 511 U.S. 127 (1994), and the Ohio Constitution. Defense counsel's failure to object was constitutionally deficient under Strickland v. Washington,466 U.S. 668 (1984)."
 {¶ 23} Without providing this court with the numbers of men and women who composed either the original venire or the final jury which determined the case, even though those facts may be gleaned from the record, Whatley argues that the record reflects that the state excused from the jury mostly women without proper reason.[1] State v. Gowdy, 88 Ohio St.3d 387,2000-Ohio-355, footnote 2.
 {¶ 24} He further argues that defense counsel failed to raise an objection to the state's actions, thus implying, without so stating, not only that counsel rendered constitutionally ineffective assistance, but further, that "plain error" occurred in the proceedings. Especially in view of the facts that, ultimately, eight women and four men comprised his jury, and that his jury, so comprised, ultimately determined his criminal actions did not deserve the death penalty, Whatley's arguments are rejected.
 {¶ 25} The record reflects Whatley filed a pretrial motion seeking to prohibit the state from using its peremptory challenges to exclude jurors who expressed concerns about their ability to impose capital punishment. The trial court granted his motion.
 {¶ 26} The nearly one thousand-page transcript of the voir dire of the venire demonstrates the parties became aware during the proceeding that certain jurors indicated a reluctance when questioned about their view of the death penalty. Similarly, some prospective jurors noted they previously had unpleasant experiences with the justice system. These jurors, for the most part, were women.
 {¶ 27} The prosecutors subsequently exercised four of their six peremptory challenges on women; defense counsel raised no objections. On the other hand, defense counsel used three of their peremptory challenges to excuse one woman and two men.
 {¶ 28} Whatley's jury eventually consisted of more women than men, which, as exemplified by his counsel's pretrial motion and, despite overwhelming evidence of Whatley's guilt, the ultimate recommendation against the death penalty in this case, clearly fit with the defense strategy.
 {¶ 29} Whately asserts the trial court erred by failing to consider whether the prosecutors' actions constituted a "prima facie" showing of gender discrimination in violation of Batsonv. Kentucky (1986), 476 U.S. 79 and J.E.B. v. Alabama (1994),511 U.S. 127.[2] He contends that the "statistical imbalance" in a prosecutor's peremptory challenges of women raised the issue pursuant to Johnson v. California (2005), ___ U.S. ___, 125 S.Ct. 2410 and a case recently decided by the United States Court of Appeals for the Ninth Circuit, viz.,Williams v. Runnels (2006), 432 F.3d 1102. This court, however, is unpersuaded.
 {¶ 30} It should first be noted that Ohio is a part of the United States Sixth Circuit. In Johnson and Williams v.Runnels, the courts considered California's interpretation ofBatson and found it to be improper. The Sixth Circuit's analysis of what constitutes a "prima facie" showing of discrimination, on the other hand, has not been deemed inappropriate.
 {¶ 31} In considering a similar argument as Whatley's, the Sixth Circuit Federal Court of Appeals recently stated the following:
 {¶ 32} "To establish a Batson violation, a defendant must first make out a prima facie case of * * * discrimination either by demonstrating an extended pattern of discrimination over many cases or by the `totality of the relevant facts' concerning a prosecutor's conduct during the defendant's own trial. [Citation omitted.] If this first step is met, the burden then shifts to the prosecutor to articulate a [facially gender]-neutral explanation for exercising the challenge. * * * Third, and finally, the trial court must then determine whether the defendant has proven purposeful discrimination. Miller-El,125 S.Ct. at 2325. Purposeful discrimination may be shown by demonstrating that the proffered explanation is merely a pretext for a [gender] motivation. [Citation omitted.] The ultimate burden of persuasion [, however,] always rests with the party challenging the strike to prove it was motivated by discriminatory animus." United States v. Katuramu (Mar. 28, 2006), U.S. 6th Cir. Nos. 04-3633/3722.
 {¶ 33} In Katuramu, the federal appeals court noted that a defendant cannot sustain his burden by asking the court to "infer pretext from an absence of evidence." (Emphasis in original.) Thus, "a determination of pretext must be made by reference to all the pertinent circumstances, `including the final make-up of the jury,' [Citation omitted]."
 {¶ 34} The foregoing approach comports with Johnson, supra. In that case, which involved a black defendant on trial for the murder of a white child, only three of the forty-three prospective jurors were black. Although the prosecutor used only three peremptory challenges, he used those challenges only on the black prospective jurors; thus, Johnson's jury was compromised of only white persons. Similarly, Williams v. Runnels, supra, the other case upon which Whatley relies, involved a black defendant accused of robbing a delicatessen; only four of the first forty-nine prospective jurors were black, and the prosecutor exercised three of his four challenges to remove blacks.
 {¶ 35} In this case, as in Katuramu, Whatley neither shows "an extended pattern of discrimination over many cases" or points to a "totality of circumstances" concerning the prosecutors' conduct in the record which would tend to support a "prima facie" showing of discrimination. Instead, he invites this court to find error simply because some women were not seated on his jury, in spite of the fact that, ultimately, three-quarters of the members of his jury were women.
 {¶ 36} Whatley cannot demonstrate on these facts that any improper "pattern" of female gender discrimination occurred during jury selection. State v. Thomas, Cuyahoga App. No. 85968, 2006-Ohio-280. Since the record thus reflects compliance with constitutional requirements, and trial counsel therefore had no cause to raise the issue, Whatley's argument is rejected.
 {¶ 37} Accordingly, his first assignment of error is overruled.
 {¶ 38} Whatley's second assignment of error states:
 {¶ 39} "II. The trial court's failure to conduct a hearing on the appellant's motion for voir dire of the state's eyewitnesses violated the [F]ourth, [F]ifth, and [F]ourteenth [A]mendments of the U.S. Constitution, State v. Shindler (1994),70 Ohio St.3d 54, State v. Cragwell, 1996 Ohio App. LEXIS 2635 and requires a new trial."
 {¶ 40} In this assignment of error, Whatley presents an argument that is based upon an improper reading of the record.
 {¶ 41} Despite his phraseology, the record reflects that the trial court considered his pretrial motion for a voir dire of identification testimony presented by any of the state's witnesses. The trial court informed defense counsel that the motion would "be held in abeyance at this point in time pending the course of trial." Counsel concurred.
 {¶ 42} Defense counsel declined thereafter to raise the matter again; thus, they waived the issue. State v. Veras (July 8, 1999), Cuyahoga App. Nos. 74416, 74466. This obviously was a strategic decision on defense counsel's part, since each witness testified he or she knew Whatley for a significant length of time prior to the incident. Id.
 {¶ 43} Accordingly, Whatley's second assignment of error also is overruled.
 {¶ 44} Whatley's third and sixth assignments of error state:
 {¶ 45} "III. Trial counsel was ineffective under the federal constitution when they (sic) failed to object to the hearsay testimony that improperly bolstered the identification of the appellant by each civilian witness who identified him."
 {¶ 46} "VI. Counsel was (sic) ineffective under the Sixth andFourteenth Amendments of the federal constitution when they failed to obtain a psychologist or psychiatrist in violation of ABA Guideline 10.4 and federal case law."
 {¶ 47} In addition to the challenge to his trial counsels' performance which Whatley raised but did not argue in his first assignment of error, he further raises two more challenges. His challenges are baseless in light of the entire record.
 {¶ 48} Despite testimony by Chalklett, Pitts, Workman and Hampton that he or she previously was acquainted with Whatley, Whatley now argues that defense counsel provided constitutionally ineffective assistance because counsel failed to object to police testimony regarding identifications made by those witnesses. Secondly, Whatley argues counsel failed to comply with the standard of representation in a capital case by neglecting to procure a medical mitigation specialist.
 {¶ 49} A claim of ineffective assistance of counsel requires proof that counsel's "performance has fallen below an objective standard of reasonable representation" and, in addition, that prejudice arises therefrom. State v. Bradley (1989),42 Ohio St.3d 136, paragraph two of the syllabus; see, also, State v.Lytle (1976), 48 Ohio St.2d 391. The establishment of prejudice requires proof "that there exists a reasonable probability that were it not for counsel's errors, the result of the trial would have been different." State v. Bradley, supra, paragraph three of the syllabus.
 {¶ 50} The burden is on appellant to prove ineffectiveness of counsel. State v. Smith (1985), 17 Ohio St.3d 98. Trial counsel is strongly presumed to have rendered adequate assistance. Id.
Moreover, this court will not second-guess what could be considered to be a matter of trial strategy.
 {¶ 51} In this case, Whatley first complains trial counsel raised no challenge to the detectives' testimony that Chalklett, Pitts, Workman and Hampton all picked Whatley's picture from photographic arrays.
 {¶ 52} Evid.R. 801(D)(1)(c) excludes from the definition of impermissible "hearsay" testimony that a trial witness made a prior identification of a defendant. State v. Houston (January 13, 1994), Cuyahoga App. No. 64574. Moreover, a review of the record demonstrates the detectives' testimony complies with R.C.2945.55, which permits trial testimony that a witness made a previous identification of the defendant. State v. Lancaster
(1971), 25 Ohio St.2d 83.
 {¶ 53} Since the record does not support a conclusion that the evidence Whatley now challenges was inadmissible, defense counsel would have no basis for an objection. State v. Gray,
Cuyahoga App. No. 83097, 2004-Ohio-1454.[3]
 {¶ 54} Similarly, the record fails to support Whatley's second complaint, presented in his sixth assignment of error, that counsel failed "to obtain the services of a psychiatrist or psychologist to assist in the defense of one charged with a capital crime." Counsel did, indeed, file a motion for the appointment of a mitigation specialist in order to, inter alia, "[c]onduct a psycho-social investigation" of their client. The trial court granted the request. Upon the conclusion of the trial proceedings, the jury ultimately decided Whatley did not deserve the death penalty for his convictions.
 {¶ 55} Consequently, under the circumstances presented in this case, Whatley cannot demonstrate defense counsels' performance fell below an objective standard of reasonable representation.
 {¶ 56} Accordingly, his third and sixth assignments of error also are overruled.
 {¶ 57} Whatley's fourth and fifth assignments of error state:
 {¶ 58} "IV. The appellant's more than minimum and consecutive sentences violate Blakely v. Washington (2004), 542 U.S. 296,State v. Porterfield, 106 Ohio St.3d 5, 2005 Ohio 3095 and is otherwise contrary to law.
 {¶ 59} "V. The sentence of life without parole for a 19-year-old offender, with no felony record, who was acquitted of being the principle (sic) offender, i.e., was not the shooter, violates the Eighth Amendment of the federal constitution as cruel and unusual punishment."
 {¶ 60} Whatley challenges his sentence in these assignments of error. He initially contends his more than minimum and consecutive sentences violate the decision in Blakely v.Washington (2004), 542 U.S. 296. Based on the Ohio Supreme Court's interpretation of Blakely as set forth in State v.Foster, ___ Ohio St.3d ___, 2006-Ohio-856, this court is constrained to agree.
 {¶ 61} The supreme court declared unconstitutional inFoster several sentencing provisions, including R.C.2929.14(B), (C) and R.C. 2929.19(B)(2), which govern the imposition of a term greater than the minimum, and R.C.2929.14(E)(4), which governs the imposition of consecutive sentences.
 {¶ 62} Therefore, in cases such as Whatley's, since the trial court relied upon the unconstitutional provisions in pronouncing sentence, the sentence is "contrary to law" and must be vacated and remanded to the trial court for a new sentencing hearing not inconsistent with Foster. Id., at ¶¶ 104-105.
 {¶ 63} The Ohio Supreme Court informed trial courts that although they no longer are "compelled to make findings and give reasons at the sentencing hearing * * * nevertheless, in exercising its discretion the court must carefully consider the statutes that apply to every felony case. Those include R.C.2929.11, which specifies the purpose of sentencing, and R.C.2929.12, which provides guidance in considering factors related to the seriousness of the offense and recidivism of the offender. In addition, the sentencing court must be guided by statutes that are specific to the case itself." State v. Mathis,109 Ohio St.3d 54, 2006-Ohio-855.
 {¶ 64} In Whatley's case, therefore, Mathis directs the trial court to consider when resentencing him not only R.C.2929.11 and.12, the statutes he raises in his fifth assignment of error, but, additionally, those statutes that pertain to aggravated murder with the named specifications, along with aggravated burglary, aggravated robbery and kidnapping, all with firearm specifications.
 {¶ 65} Based upon the foregoing, Whatley's fourth assignment of error is sustained. His fifth assignment of error is therefore moot.
 {¶ 66} Whatley's seventh assignment of error states:
 {¶ 67} "VII. The cumulative errors deprived the appellant of due process under the Fourteenth Amendment of the federal constitution."
 {¶ 68} In view of this court's disposition of Whatley's previous assignments of error relating to his convictions, this assignment of error lacks merit and, accordingly, is overruled.
 {¶ 69} Whatley's convictions are affirmed. His sentence is vacated and this case is remanded for a new sentencing hearing pursuant to State v. Foster, supra.
It is ordered that appellee and appellant share costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, A.J. Concurs McMonagle, J. Concurs (See concurringopinion attached)
[1] This court notes that this is the second time this same appellate attorney has raised this issue without providing either an adequate description of the facts contained in the record or a complete discussion of the issue he raises on behalf of his client. See, State v. Thomas, Cuyahoga App. No. 85968,2006-Ohio-280. Appellate counsel is admonished to more thoroughly present his arguments with regard to his assignments of error in the future.
[2] This case involved a paternity action in which the state used its peremptory challenges to empanel an all-female jury.
[3] It seems relevant at this point to reemphasize that Whatley raises no claims that his convictions are unsupported by either sufficient evidence or the weight of the evidence. This is not surprising, since the state presented overwhelming evidence of his guilt. Moreover, in view of Whatley's leadership role before, during, and after the crimes, a reasonable jury could even have determined he was the principal offender. Under these circumstances, for Whatley now to call trial counsels' skill, both in shaping a jury which included people who retained misgivings about the death penalty and then in persuading that jury Whatley did not commit a death penalty offense, "ineffective," elevates process over a successful outcome for the client.
 CONCURRING OPINION